*PK*

D-Juan Owens

13-cv-7568

Judge Dow

v.

P.O. Ellison

Dexter Moore's Deposition read on 4/4/2017 during jury trial

**F I L E D**

APR X 4 2017

Judge Robert M. Dow, Jr.
United States District Court

**DEXTER MOORE**
**D-JUAN OWENS vs. CITY OF HARVEY**                    **January 2, 2015**

---

**1**

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

D-JUAN OWENS,          )
        Plaintiff,     )
                       )
vs.                    )  No. 13 CV 7568
P.O. ELLISON, P.O. KELLY, )
Individually, and the CITY )
OF HARVEY, a municipal )
corporation,           )
        Defendants.    )

        The deposition of DEXTER MOORE
called as a witness for examination, taken pursuant
to the Federal Rules of Civil Procedure of the
United States District Courts pertaining to the
taking of depositions, taken before MARCY REITER,
a Notary Public within and for the County of Cook,
State of Illinois, and a Certified Shorthand
Reporter of said state, CSR No. 84-1890, taken at
Suite 2140, 30 North LaSalle Street, Chicago,
Illinois, on the 2nd day of January, A.D. 2015, at
11:00 a.m.

---

**2**

1   PRESENT:
2
3   GREGORY E. KULIS & ASSOCIATES,
4   (30 North LaSalle Street, Suite 2140,
5   Chicago, Illinois 60602,
6   312-580-1830), by:
7   MR. JOSHUA S. PATRICK,
8   jpatrick@kulislawltd.com,
9       appeared on behalf of the Plaintiff;
10
11  O'HALLORAN KOSOFF GEITNER & COOK, LLC,
12  (650 Dundee Road, Suite 475,
13  Northbrook, Illinois 60062,
14  847-291-0200), by:
15  MS. KATHARINE P.A. SMEENK,
16  ksmeenk@okgc.com,
17      appeared on behalf of the Defendants.
18
19  ALSO PRESENT:
20  MR. D-JUAN OWENS.
21
22
23
24  REPORTED BY: MARCY REITER, CSR No. 84-1890.

---

**3**

1           (WHEREUPON, the witness was duly
2       sworn.)
3           DEXTER MOORE,
4   called as a witness herein, having been first duly
5   sworn, was examined and testified as follows:
6           EXAMINATION
7   BY MS. SMEENK:
8       Q.   Good morning, sir. Can you please
9   state and spell your name for the record.
10      A.   My name is Dexter Moore, D-e-x-t-e-r
11  M-o-o-r-e.
12      MS. SMEENK: Let the record reflect that this
13  is the deposition of Dexter Moore, taken pursuant
14  to all applicable Federal Rules of Civil Procedure
15  as well as the local rules of the Northern
16  District of Illinois.
17  BY MS. SMEENK:
18      Q.   Mr. Moore, my name is Katherine Smeenk.
19  I represent the Defendants in this case, a lawsuit
20  filed by who I believe is your stepson --
21      A.   Yes.
22      Q.   -- Mr. D-Juan Owens. I'll just be
23  asking you a few questions this morning with
24  regards to incidents that he has alleged in his

---

**4**

1   complaint.
2           Have you ever given a deposition
3   before?
4       A.   No, I haven't.
5       Q.   All right. So we'll go over a few
6   ground rules.
7           You understand you're under oath here
8   today?
9       A.   Yes, ma'am.
10      Q.   So all your answers you give today have
11  to be verbal for the benefit of the court
12  reporter. She can't take down any written --
13  sorry, any nonverbal gestures, like shakes of the
14  head, any uh-huhs, that sort of thing. If you
15  mean to say yes, you have to actually say yes just
16  so that we have a clear record.
17          In addition, I might be asking you
18  pretty obvious questions at times, but just for
19  the sake of the court reporter, please let me
20  finish my questions before you start to answer so
21  that we have a clear record.
22          If you do not understand any of my
23  questions, please just say that and I'll be happy
24  to rephrase it for you. If you do answer a

---

**DEXTER MOORE**
**D-JUAN OWENS vs. CITY OF HARVEY**

January 2, 2015

**5**

1  question, I'll presume that you understood it. Is
2  that fair?
3     A.   That's fair.
4     Q.   Okay.  You can take a break whenever
5  you want during this deposition, although I don't
6  anticipate it to be long.  As long as there's -- I
7  just ask if there's a question pending, that you
8  answer that question before you take a break,
9  okay?
10    A.   Okay.
11    Q.   All right.  And we're just looking for
12  what you remember here today.  We don't want you
13  to guess at anything or anything like that.  So if
14  you don't know, just please let us know that,
15  okay?
16    A.   Okay.
17    Q.   All right.  Are you on any medications
18  today?
19    A.   No, I'm not.
20    Q.   Have you taken any in the last 24 to
21  48 hours?
22    A.   No.
23    Q.   Okay.  Have you consumed any drugs or
24  alcohol in the last 12 hours?

**6**

1     A.   Beer.  I mean, yes, I have, yes.  Beer,
2  yeah.
3     Q.   Okay.  How many beers?
4     A.   I had about four beers last night.
5     Q.   Okay.  What time?
6     A.   Around football time.  I'd say around
7  six or seven o'clock.
8     Q.   What kind of beers were they?
9     A.   Miller's.
10    Q.   Okay.
11    A.   High Life.
12    Q.   And where did you consume those beers?
13    A.   Oh, at my son's house on 75th -- 76th
14  and Essex.
15    Q.   You guys were just watching football
16  games?
17    A.   Watching football, Alabama and Ohio
18  State.
19    Q.   All right.  Pretty good game, right?
20    A.   Yes, ma'am.
21    Q.   What is your date of birth, sir?
22    A.   12/24/51.
23    Q.   Have you ever used any other dates of
24  birth before?

**7**

1     A.   No, I haven't.
2     Q.   Okay.  So you just celebrated your
3  birthday?
4     A.   Yes, I have.
5     Q.   Happy belated.
6     A.   Thank you.
7     Q.   Have you ever used any other names
8  besides Dexter Moore?
9     A.   No, I haven't.
10    Q.   Do you go by any nicknames?
11    A.   Larry.
12    Q.   Larry.  Any other nicknames?
13    A.   No.
14    Q.   All right.  And why is Larry your
15  nickname?
16    A.   It's just a name I used one time when I
17  had got arrested.  And I gave, you know, a name
18  that -- well, basically I was -- I had a warrant
19  on me, so I didn't give my real name.  That's why
20  I used the name Larry.
21    Q.   And when was that that you got
22  arrested?
23    A.   That's been about maybe seven, eight
24  years ago.

*(handwritten:)* ① sustained 403 other arrests

**8**

1     Q.   What was the warrant for?
2     A.   DUI.
3     Q.   Was that in Illinois?
4     A.   Yes.
5     Q.   And you were eventually arrested on
6  those charges?
7     A.   Yes, I was.
8     Q.   And were you convicted?
9     A.   Convicted in -- I mean, convicted, I
10  mean, what you said about being convicted, I was
11  charged and I went to -- to a program.
12    Q.   Okay.  And you were eventually in court
13  and you were sentenced, but the sentence that you
14  received was to do time in a rehabilitation
15  program?
16    A.   Rehabilitation, yes, ma'am.
17    Q.   But you were convicted on those DUI
18  charges?
19    A.   Right.
20    Q.   But you didn't serve any time?
21    A.   I didn't serve no time, no, no.
22    Q.   Okay.  Was your license suspended after
23  that?
24    A.   Well, I didn't have a license.

**DEXTER MOORE**
**D-JUAN OWENS vs. CITY OF HARVEY**                    January 2, 2015

**9**

1    Q.   Okay.  So you were driving without a
2  license?
3    A.   I was driving without -- yeah, I was
4  driving without a license.
5    Q.   Have you ever had a license?
6    A.   Yes, I have, but that was -- that was
7  suspended in Alabama.
8    Q.   I'm sorry.  Say it again.
9    A.   It was suspended in Alabama.
10    Q.   When was your license suspended in
11  Alabama?
12    A.   That was, I'd say, maybe early '70s.
13    Q.   Okay.  Did you ever have a license in
14  Illinois?
15    A.   I never had a license in Illinois, no.
16    Q.   Have you since gotten your license
17  reinstated in Alabama?
18    A.   No, no.
19    Q.   Have you ever given any other nicknames
20  to the police besides Larry?
21    A.   No, I haven't.
22    Q.   Are there any street names or anything
23  like that that you go by besides --
24    A.   No.

*(handwritten left margin:)*
2) Overruled 401

3) Sustained 403 other police encounters + "street names"

**10**

1    Q.   -- Dexter Moore?
2    A.   Dexter, yeah.
3    Q.   Have you ever spelled your name
4  differently than D-e-x-t-e-r M-o-o-r-e?
5    A.   No, I haven't.
6    Q.   Okay.  I'll ask that you give me your
7  Social Security number, and we'll go off the
8  record for that, if that's okay.
9         (WHEREUPON, discussion was had off
10         the record.)
11    MS. SMEENK:  Let the record reflect that
12  Mr. Moore complied with my request to provide his
13  Social Security number off the record.
14  BY MS. SMEENK:
15    Q.   Have you ever used any other Social
16  Security numbers besides the one you --
17    A.   No, I haven't.
18    Q.   -- just provided me?
19    A.   No, I haven't.
20    Q.   You don't recall your driver's license
21  number that you did have in Alabama, do you?
22    A.   No, I don't.
23    Q.   I thought it was a long shot.
24         What is your current telephone number?

**11**

1    A.   Cell or house?
2    Q.   Both.
3    A.   Okay.  Well, the house number in
4  Alabama is 205-425-54860.
5    Q.   205-425-54860?
6    A.   Yes.
7    Q.   Isn't that one too many numbers?
8    A.   54860 -- 425-4860.  205 is the area
9  code for Alabama, okay, 425-4860.
10    Q.   Okay.  I had one extra five there.
11         And your cell?
12    A.   Okay.  It's also 205 --
13    Q.   Okay.
14    A.   -- 475-5593.
15    Q.   Have you had any other telephone
16  numbers in the last five years previous to --
17  besides these, rather?
18    A.   Yes, I have, but I don't remember them.
19    Q.   How long have you had that cell phone
20  number for?
21    A.   The cell phone?
22    Q.   Yes, that you just gave me.
23    A.   That I just gave you, for about a year.
24    Q.   One year.  And do you remember your

*(handwritten right margin:)*
4) Sustained as to 10:24 - 11:14 (401) and 12:18-20 (403); otherwise Overruled (401)

**12**

1  cell phone number before that?
2    A.   260-2855.
3    Q.   Same 205 area code?
4    A.   Same area code, yeah.
5    Q.   All right.  How long did you have that
6  cell phone number for?
7    A.   Until -- until I lost it.  I mean, I
8  can't --
9    Q.   All right.  Well, you had this one for
10  about a year.  Did you have that one for about a
11  year or did you have it longer?
12    A.   I had it longer than a year, the one
13  that -- the 260, I had it for longer than a year.
14    Q.   Okay.  And who is your cell phone
15  provider?
16    A.   SafeLink.
17    Q.   For both numbers?
18    A.   For both numbers, yeah.  Well, a
19  government phone, you know, a government provided
20  phone, SafeLink.
21    Q.   All right.  In October 2011, were you
22  using either of those cell phone numbers or did
23  you have a different number?
24    A.   I had the 260.

**DEXTER MOORE**
**D-JUAN OWENS vs. CITY OF HARVEY**

January 2, 2015

*(handwritten left margin):*
⑤
Overruled D
401

⑥
Sustained
401
irrelevant D
+ waste
of time

**13**

1 Q. Okay. What about were you living in
2 Illinois in October 2011?
3 A. Briefly, yes, I was.
4 Q. Okay. And did you have a different
5 home phone number at that time?
6 A. I still had -- I still had the same
7 home phone number.
8 Q. Okay. So you had your place --
9 A. I just had the cell phone number.
10 Q. All right. You had an apartment in
11 Alabama, though?
12 A. No. I got a home in Alabama. I mean,
13 when I say "home," it was a home that my mother
14 had left us after she passed, my sisters and
15 brothers. So the house number been the same there
16 for --
17 Q. A long time?
18 A. -- for a long, long time.
19 Q. Okay. And is that where you live now,
20 in that house?
21 A. Yes, ma'am.
22 Q. Do you live with anyone else in that
23 house?
24 A. My brother stay there.

**14**

1 Q. Your brother or brothers?
2 A. My brother, me and my brother. I
3 just -- me and my brother.
4 Q. What's your brother's name?
5 A. Johnny Moore.
6 Q. Does he have a middle name?
7 A. Lee.
8 Q. Lee. And do you have a middle name?
9 A. Ray.
10 Q. R-a-y?
11 A. R-a -- yes, ma'am, yes.
12 Q. Are you currently married?
13 A. No, I'm not.
14 Q. Have you ever been married?
15 A. No.
16 Q. At the start of the deposition, I
17 understood that you are the plaintiff's
18 stepfather, is that correct?
19 A. Yes, I am.
20 Q. All right. But you were never married
21 to his mother?
22 A. No.
23 Q. You're just in a dating relationship,
24 partnership?

**15**

1 A. Right. Yes, ma'am.
2 Q. When did that start?
3 A. I'd say around 2000 -- maybe 1999.
4 Q. 1999?
5 A. 1998, '99. I'm not for sure.
6 Q. Are you still in that relationship?
7 A. Off and on.
8 Q. Okay. Was there a period of time where
9 it was kind of on all the time until it started
10 being off and on?
11 A. I mean, at a period of time, it was --
12 it was -- well, see, I stayed here for 17 years in
13 Chicago before I moved back to Alabama.
14 Q. Okay.
15 A. Okay. We had a daughter, me and his
16 mom. And when she passed away, I moved back to
17 Alabama when my daughter passed.
18 Q. Okay.
19 A. So I can say my daughter would be about
20 30 years old now, so I'd say I left -- when I left
21 Illinois, it was maybe back in two thousand and --
22 2012.
23 Q. All right. And then at that time, did
24 your relationship with D-Juan's mother become off

**16**

1 and on?
2 A. I mean, you know, I would come back and
3 visit, you know, like I am now, and stay. You
4 know, I still see her, but we weren't out in a
5 relationship like we was when we first started
6 off.
7 Q. So that's what I'm trying to
8 understand. When did that kind of period of being
9 together end; 2012?
10 A. 2012, 2013. You know, I mean, I'm not
11 for sure. I'm not for sure.
12 Q. But in October 2011, you were in a
13 relationship with --
14 A. Yes, I was.
15 Q. -- D-Juan's mother at that time?
16 A. Yes, I was. Yes, I was. Yes, yes.
17 Q. Just wait until I finish asking the
18 question.
19 A. I'm sorry. I'm sorry. I will.
20 Q. All right. And were you living with
21 her at that time?
22 A. Yes, I was.
23 Q. Was there anybody else living with you
24 in the house in 2011?

**DEXTER MOORE**
**D-JUAN OWENS vs. CITY OF HARVEY**                          January 2, 2015



**17**

1   A.   No.  Me and her.
2   Q.   Right.
3   A.   Just me and her, yes.
4   Q.   And what address were you living at?
5   A.   149 -- 14902 Marshfield.
6   Q.   South Marshfield?
7   A.   Marshfield, yeah.
8   Q.   In Calumet Park?
9   A.   In Harvey.
10  Q.   In Harvey.  Okay.
11       How long did you live at that address
12  for?
13  A.   Maybe a year or two.
14  Q.   So from when until when?
15  A.   I can't remember.
16  Q.   Okay.  Prior to that, where were you
17  living?
18  A.   We lived at 12210 South Union.
19  Q.   That's also in Harvey?
20  A.   No.  That's in Chicago.
21  Q.   And how long were you at that address
22  for?
23  A.   Years.  I can't remember.
24  Q.   Okay.

**18**

1   A.   We was there for a while.
2   Q.   Again, with D-Juan's mother?
3   A.   With D-Juan's mother, yeah.
4   Q.   Anybody else live with you at that
5   address?
6   A.   Him, his other sisters and brothers.
7   Q.   And when you moved from 14902 South
8   Marshfield, where did you move to; back to
9   Alabama?
10  A.   I went back to Alabama.
11  Q.   Okay.  I don't know if you gave me your
12  address in Alabama.
13  A.   5104 6th Street South, Lipscomb,
14  Alabama 35020.
15  Q.   And the city's name was what?
16  A.   L-i-p-s-c-o-m-b.
17  Q.   Why did you move back to Alabama in
18  2012?
19  A.   I wanted to go back home.  That's where
20  I was born and raised, in Alabama.
21  Q.   So you still had most of your family
22  back there?
23  A.   Yes, I do.
24  Q.   Did you have a job lined up there when

**19**

1   you left?
2   A.   Yes, I did.
3   Q.   Doing what?
4   A.   Construction.
5   Q.   For what construction company?
6   A.   Ceco Masonry, C-e-c-o, a bricklayer,
7   brickwork.
8   Q.   So that's what you're doing for them,
9   bricklaying?
10  A.   Not now.  I'm on disability.
11  Q.   Okay.  But when you left in 2012?
12  A.   Yeah, yeah.  I was doing brickwork,
13  yeah, masonry work, yes.
14  Q.   And why are you on disability
15  currently?
16  A.   I fell off a roof and my hip was
17  partially fractured.  My hip was fractured.
18  Q.   Okay.  When did that happen?
19  A.   About a year ago.
20  Q.   Okay.  Was that during a work incident,
21  that you fell off the roof?
22  A.   Yes, it was.
23  Q.   Were there any lawsuits filed with
24  regards to that incident?

*(Handwritten margin note:)* ⑦ Sustained 401 + 403 (waste of time)

**20**

1   A.   No, there wasn't.
2   Q.   Have you ever filed any lawsuits
3   before?
4   A.   No, I haven't.
5   Q.   Other than the DUI charges you told me
6   about earlier, have you ever been a defendant in
7   any other lawsuits?
8   A.   No, I haven't.
9   Q.   Have you had any other criminal charges
10  besides that DUI lawsuit?
11  A.   Yes, I have.
12  Q.   Okay.  What are those?
13  A.   I was -- I did a year probation for
14  receiving stolen property.
15  Q.   When was that?
16  A.   That was back in 199 -- '96.
17  Q.   Okay.  Anything else?
18  A.   That's it.
19  Q.   All right.  So no other felony
20  convictions or crimes involving dishonesty?
21  A.   No, there's not.
22  Q.   What's your highest level of education?
23  A.   Finished high school.
24  Q.   You went to high school in Alabama?

DEXTER MOORE
D-JUAN OWENS vs. CITY OF HARVEY

January 2, 2015

## Page 21

1    A.  Yes, ma'am.

2    Q.  Prior to working for the Ceco Masonry

3  company, where were you working?

4    A.  I worked at -- I can't remember. But I

5  have had quite a few jobs.

6    Q.  I'm sure.

7    A.  Let me think about that one for a

8  minute.

9    Q.  Sure.

10    A.  Okay.

11    Q.  Well, were you working somewhere in

12  Illinois?

13    A.  Illinois Central Railroad.

14    Q.  Okay. What were you doing for them?

15    A.  Cleaning suburban cars.

16    Q.  All right.

17    A.  I worked for Sears, too, in Chicago.

18    Q.  Okay. Can you tell me when -- what did

19  you do for Sears, first of all?

20    A.  What would you call it? Maintenance.

21    Q.  Maintenance.

22    A.  You know, cleaning the floor.

23    Q.  Cleaning the store?

24    A.  Cleaning the store, yeah.

## Page 22

*(⑧ Sustained 401)*

1    Q.  All right. When did you work for

2  Illinois Central Railroad?

3    A.  That had to have been back in 1980,

4  '9 -- I'm not for sure.

5    Q.  All right. What about Sears?

6    A.  I'm not for sure on that one, neither.

7  But I knew before -- I worked for Sears before I

8  went to the railroad.

9    Q.  So that was even earlier than 1980?

10    A.  Yeah, yeah.

11    Q.  All right. So were you working

12  somewhere right before you left for Alabama? Did

13  you leave a job to move to Alabama?

14    A.  I was on -- I was on the assistance.

15    Q.  Okay.

16    A.  I mean, you know, food stamps, you

17  know. I mean, you know, assistance.

18    Q.  So you were unemployed at that time?

19    A.  At the time, yeah.

20    Q.  And in October 2011, were you working?

21    A.  I was unemployed.

22    Q.  Okay. Did you hold any other jobs

23  after working for the Illinois Central Railroad

24  before working for Ceco Masonry?

## Page 23

1    A.  I can't remember.

2    Q.  All right. Were you ever involved with

3  Dino's Towing Company in any way?

4    A.  Well, this company, I wasn't involved

5  with it, but I knew of it, you know.

6    Q.  Did you work for it at all, for that

7  company?

8    A.  No.

9    Q.  Okay. Do you wear glasses or contacts?

10    A.  No, I don't.

11    Q.  When is the last time you had your

12  vision tested?

13    A.  I can't remember.

14    Q.  All right. When is the last time

15  were at a doctor?

16    A.  The last time I was at a doctor? Last

17  month.

18    Q.  Okay. For your hip?

19    A.  Just for a physical.

20    Q.  Okay. Let's talk about October 23,

21  2011. Do you remember that night?

22    A.  Yes, I do.

23    Q.  All right. And I understand that you

24  and Mr. Owens -- if I say Mr. Owens or D-Juan, can

## Page 24

1  we agree that we're talking about your stepson?

2    A.  Yes, yes, yes.

3    Q.  Okay.

4    (Continuing) That you and Mr. Owens

5  were at the Ridez car dealership at 39 East 147th

6  Street in Harvey?

7    A.  Yes.

8    Q.  And that's on the block of 147th that's

9  in between Justine Street and Vine Avenue,

10  correct?

11    A.  Right.

12    Q.  And you were there around 11:30 p.m.?

13    A.  I can't remember the exact time, but we

14  was in the vicinity, yeah.

15    Q.  It was nighttime, though?

16    A.  It was nighttime, yeah.

17    Q.  Kind of later in the evening?

18    A.  Yeah. We was -- I mean, it was during

19  the summer, so I can't say how late, but it was --

20  it was dark.

21    Q.  Okay. Why did you go to the Ridez car

22  dealership with D-Juan?

23    A.  To steal.

24    Q.  To steal what?

**DEXTER MOORE**
**D-JUAN OWENS vs. CITY OF HARVEY**                    January 2, 2015

*(handwritten left margin)*
9) Sustained (403) except 25:16-18 probative + 401/403 balance weighs in favor of admitting

**Page 25**

1    A.   Catalytic converters.
2    Q.   Okay.  And did you guys talk about what
3  you were going to do once you got to the car
4  dealership?
5    A.   Yeah.  We decided that I would be the
6  lookout and he was going in.
7    Q.   Why did you decide that you would be
8  the lookout?
9    A.   Because, you know, he was younger and
10 probably more faster on his feet than I was.
11   Q.   Okay.  Had you done that sort of thing
12 before?
13   A.   Do I have to answer that?
14   Q.   Yeah.
15   A.   Yeah.
16   Q.   Okay.  When?
17   A.   I can't give you the exact time of when
18 and where, but we had pulled off a couple jobs.
19        Am I incriminating myself?
20   Q.   No.  I mean, this is a civil case.
21   A.   Okay.
22   Q.   This is a long time ago that this
23 happened.  We're just asking you questions for
24 purposes of the civil case.

**Page 26**

1    A.   All right.
2    Q.   I'm not a state's attorney.  I'm not
3  here to ask you any sort of questions that are
4  going to lead to criminal charges.
5    A.   Oh, okay.
6    Q.   But it is on the record.
7    MR. PATRICK:  The statute of limitations
8  probably ran out on anything we're talking about
9  years ago.
10 BY MS. SMEENK:
11   Q.   All right?
12   A.   All right.
13   Q.   So the two of you had done this before?
14   A.   Yeah.  We had, yeah.
15   Q.   On how many occasions?
16   A.   Maybe one or two.
17   Q.   From Ridez or from other locations?
18   A.   No.  Other locations.
19   Q.   In the City of Harvey?
20   A.   City -- I mean, in Chicago, period.  I
21 can't just say Harvey.
22   Q.   The Greater Chicago area?
23   A.   The Greater Chicago area.
24   Q.   What kind of car were you driving that

**Page 27**

1  night?
2    A.   We was in a tow truck.
3    Q.   A tow truck?
4    A.   We was in his tow truck, yeah.
5    Q.   Do you know what kind of truck that is?
6    A.   It was a tow truck.  It was a Chevy.
7    Q.   A Chevy.  Do you remember the color of
8  it?
9    A.   Black.
10   Q.   The year?
11   A.   I don't know.  I can't recall what
12 year.
13   Q.   Sir, I'll just ask, I'm sure for her
14 benefit as well, if you're giving answers, just
15 make sure you kind of enunciate them so we know
16 what you're saying because it's hard for me to
17 understand and it's hard for her to take down kind
18 of like mumbled answers.
19   A.   Okay.
20   Q.   Thank you.
21        Where were you driving from?
22   A.   We was leaving the house on 149th and
23 Marshfield.
24   Q.   And then you drove straight to Ridez?

**Page 28**

1    A.   Right.  Well, he drove straight to
2  Ridez.  I was on the passenger side.
3    Q.   Okay.  So he drove.  Where did you guys
4  park?
5    A.   Parked across the street on Vine from
6  the car lot.
7    Q.   Sorry.  Say that one more time.  You
8  parked on Vine?
9    A.   Across the street from the car lot.
10   Q.   Okay.  On Vine Avenue?
11   A.   On Vine Avenue.
12   Q.   Okay.  And what direction were you
13 facing, north or south?
14   A.   North.
15   Q.   Okay.  And you were in the passenger
16 seat?
17   A.   Yes.
18   Q.   When D-Juan got out to go into the
19 Ridez car dealership, you stayed in the car,
20 right?
21   A.   I stayed in the truck, yes.
22   Q.   Did you stay in the passenger seat or
23 did you --
24   A.   Yes.

**DEXTER MOORE**
**D-JUAN OWENS vs. CITY OF HARVEY**                                    **January 2, 2015**

---

**29**

1  Q.  – move over to the driver's seat?
2  A.  I stayed in the passenger seat.
3  Q.  And you parked on Vine Avenue because
4  the entrance to Ridez was on Vine Avenue, right?
5  A.  Yes.
6  Q.  Okay.  And is there a fence around the
7  Ridez lot?
8  A.  Yes, there is.
9  Q.  All right.  There's a fence on Justine,
10 right?
11 A.  Justine, yeah.
12 Q.  And then there's a fence on the north
13 side of the Ridez lot, right?
14 A.  Yes.
15 Q.  Okay.  But not on the Vine Street side?
16 A.  No.
17 Q.  Okay.  Vine Avenue, I should say.
18     And on the other side of – the north
19 side where there's a fence, on the other side of
20 that fence there's an alleyway, right?
21 A.  There's an alleyway, yes.
22 Q.  Do you remember how tall those fences
23 are, approximately?
24 A.  I can't – I can't say.

---

**31**

1  A.  Yeah.
2  Q.  What about a saw?
3  A.  I'm not for sure.
4  Q.  All right.  And did he have anything
5  else with him, any sort of bag or anything like
6  that for the converters?
7  A.  No.
8  Q.  Okay.  So when D-Juan got out of the
9  car, where did he go?
10 A.  Went over, kind of across the fence,
11 and went in the lot and went on to do his
12 business, what he went in there for.
13 Q.  Okay.  So he went over a fence to get
14 into the lot?
15 A.  We had cut the fence already.
16 Q.  Okay.  Where did you cut the fence?
17 A.  We cut it on the side of – on the
18 side, on the back side of the lot.
19 Q.  Okay.  On the north side or on Justine
20 Street?
21 A.  Not on Justine.  On the north side of
22 the fence.
23 Q.  Okay.  And what did you cut it with?
24 A.  Some bolt cutters.

---

**30**

1  Q.  Six feet?
2  A.  No.  They are shorter than six.
3  Q.  Four feet?
4  A.  Five, maybe.  Four or five, yeah.
5  Q.  As an estimate?
6  A.  Okay.
7  Q.  What were you looking out for?
8  A.  I'm looking out for police, anybody
9  that come that might intervene in what he's doing,
10 I mean, what he's doing – I mean, what he's
11 trying to do and what he did.  I called him and
12 let him know when I see somebody coming, like
13 police or something like that.
14 Q.  So did you talk about what you were
15 going to do if you saw someone coming?
16 A.  Call him.
17 Q.  You were going to call him?
18 A.  I was going to call him.
19 Q.  On his cell phone?
20 A.  On his cell phone, yes.
21 Q.  Did D-Juan have any tools with him or
22 anything like that when he got out of the car?
23 A.  He had a couple wrenches on him.
24 Q.  Wrenches?

---

**32**

1  Q.  And how big a hole did you make?
2  A.  A hole about this big (indicating), a
3  big enough hole for him to get through.
4  Q.  Why did he go through the north side if
5  there was no fence on Vine Avenue?
6  A.  I'm saying, the fence is surrounding,
7  okay.  Vine is going north.  The car lot is
8  surrounded with a fence.  So we cut the fence on
9  the back side of the lot, not on the front side of
10 Vine.  The front side of Vine, that's 147th going
11 east and west.
12 Q.  Right.
13 A.  We cut it on the back side.
14 Q.  Okay.  So your testimony is there's a
15 fence all the way around?
16 A.  All the way around the lot, yes.
17 Q.  And there's also some sort of a little
18 house?
19 A.  Houses, yes, on Vine going through –
20 across 147th Street.
21 Q.  But there's also a little like officer
22 house on the Ridez car dealership lot, right?
23 A.  Right, right.
24 Q.  And that's close to Vine Avenue?

---

**ESQUIRE SOLUTIONS**                          **800.211.DEPO (3376)**
                                               **EsquireSolutions.com**

DEXTER MOORE                                              January 2, 2015
D-JUAN OWENS vs. CITY OF HARVEY

**33**

1    A.   Yes.
2    Q.   Were you parked in front of that house?
3    A.   Parked across the street.
4    Q.   Across the street from that?
5    A.   Right, right.
6    Q.   So when D-Juan got out and he went in
7    the lot of the Ridez dealership, could you see
8    him?
9    A.   Yes.
10   Q.   The house wasn't blocking your vision
11   at all?
12   A.   No, it wasn't.
13   Q.   Or the office?
14   A.   No, it wasn't.
15   Q.   So could you see which truck he went
16   under or car?
17   A.   It was a U-Haul.
18   Q.   A U-Haul.  Where was that U-Haul
19   positioned?
20   A.   It was positioned in the lot.
21   Q.   Which part of the lot?
22   A.   The part of the lot on the side of the
23   street that -- where the cars be parked at.
24   Q.   Okay.  There's cars parked all over.

**34**

1    A.   All over.  That's what I'm saying.  But
2    the truck was also parked.  In other words, the
3    truck had parts in it.
4    Q.   The truck had what?
5    A.   Parts.
6    Q.   Parked?
7    A.   Parts.
8    Q.   Parts.  Sorry.
9         What part of the lot was it in?  Was it
10   the north side, the west side, the south side.
11   A.   It was in the -- I can't -- I can't say
12   what side the truck was in, I mean, was it north,
13   south, east or west, but it was in the lot.
14   Q.   Right.
15   A.   You know.
16   Q.   Okay.  Did he just go under one truck
17   or many?
18   A.   He went up on the -- I'm saying, he
19   went in the truck.  The truck had parts in it.  He
20   broke into the back of the truck.
21   Q.   Okay.
22   A.   The U-Haul truck, that's where the
23   parts was.
24   Q.   Okay.

**35**

1    A.   So he went in the truck, in the back
2    part of the truck.
3    Q.   All right.  And then after he went in
4    the back of that truck, did he go anywhere else?
5    A.   Not that I know of.
6    Q.   All right.  So you only saw him go
7    underneath the --
8    A.   Not underneath.
9    Q.   In the back of the truck?
10   A.   In the back of the U-Haul truck, yeah.
11   Q.   And did you see him take anything out
12   of the back of the truck?
13   A.   He didn't have time to take nothing out
14   because the police -- I called him.  The police
15   was coming.
16   Q.   Okay.  So you saw the police arrive
17   then?
18   A.   Yeah.  I called him and told him,
19   Police.  He ran through the gate.
20   Q.   Okay.  We'll get there.
21        So how long had D-Juan been in the
22   Ridez parking lot before you saw the police
23   arrive?
24   A.   Maybe about 10, 15 minutes.

**36**

1    Q.   Okay.  And you did see the police
2    arrive, right?
3    A.   Yeah.
4    Q.   And where did you see them arrive at in
5    relation to where you were?
6    A.   Coming up 147th.
7    Q.   Okay.  And did they eventually stop,
8    the police car?
9    A.   Yeah, they stopped.
10   Q.   Was it one car or many?
11   A.   It was one car with two police officers
12   in it.  One got out, went up in the lot.  He come
13   out the fence.  The officer -- well, both officers
14   got out.  One chased him.  One went back and got
15   in the car, and he ran through the houses off of
16   Justine.
17        And I saw the officer, I mean, not
18   throw him down, but he fell down.  I don't know
19   what happened to him.  And he had his hands up.
20   And I saw the officer strike him.  And then the
21   other officer came around in the police car, which
22   he was over on Ashland by then.
23   Q.   Okay.
24   A.   They chased him from the lot to over on

ESQUIRE SOLUTIONS                          800.211.DEPO (3376)
                                           EsquireSolutions.com

**DEXTER MOORE**
**D-JUAN OWENS vs. CITY OF HARVEY**                    **January 2, 2015**

**37**

1  Ashland.
2      Q.  Okay.  So there's a lot of information
3  there, so we're just going to kind of break it
4  down and go back step by step, okay?
5      A.  Okay.
6      Q.  So you said the officers parked their
7  police car on 147th street, right?
8      A.  Right.
9      Q.  Okay.
10     MS. SMEENK:  Let's do this.  Let's use this
11  map.  Mark this as Exhibit 1.
12         (WHEREUPON, said document was
13         marked Moore Deposition Exhibit
14         No. 1, for identification, as of
15         1/2/15.)
16         (WHEREUPON, a recess was had.)
17     MS. SMEENK:  Can you read the last question
18  and answer back.
19         (WHEREUPON, the record was read by
20         the reporter as requested.)
21  BY MS. SMEENK:
22     Q.  So I'm showing you what has been marked
23  as Exhibit No. 1.  I'll have you just make a
24  couple indications on here.  It's a map of the

**39**

1  portion of Vine that was south of 147th?
2      A.  Yeah, right down going south there on
3  147th, yes.
4      Q.  So why don't you put an X where you
5  were parked on Vine Avenue.
6      A.  Right here (indicating), right before
7  you get to 147th; not on 147th, but right at the
8  intersection before you get to 147th.
9      Q.  All right.  So that makes more sense to
10  me based on what you told me before.
11         And you were facing north, right?
12     A.  Right.
13     Q.  Okay.  And so you saw the police
14  officers get out of the car, you said, right?
15     A.  Right.  Yes, I did.
16     Q.  And then where did the -- what did the
17  officers look like?
18     A.  It was two black dudes, one tall, one
19  was short.
20     Q.  Could you tell about how old they were?
21     A.  No, I couldn't.
22     Q.  Had you ever seen either of these
23  officers before then?
24     A.  No, I haven't.

**38**

1  area where the Ridaz car dealership is located.
2  Does that look familiar to you?
3      A.  Yeah.
4      Q.  So can you just mark with this pen, put
5  an X -- or, actually, put a "P" where the police
6  car pulled up and parked.
7      A.  Right here (indicating).
8      Q.  So basically right at the end of Vine
9  Avenue on 147th Street?
10     A.  147th, yeah.
11     Q.  And they were facing west, is that
12  right?
13     A.  West.
14     Q.  Okay.  Do you remember, was the car on
15  the north side or the south side of 147th?
16     A.  It was on the north side.  It was
17  coming down east.
18     Q.  Okay.  That makes sense.
19     A.  Yeah.  It was parked on the north side.
20     Q.  So you told me earlier that you were
21  parked on Vine Avenue?
22     A.  Yeah.  Right here on Vine (indicating),
23  yeah.
24     Q.  Okay.  So you were on the south -- the

**40**

1      Q.  Have you seen them since?
2      A.  No.
3      Q.  And what did you do when you saw the
4  officers pull up?
5      A.  I called him, my stepson.
6      Q.  D-Juan?
7      A.  And told him the police is here.
8      Q.  Okay.  So you're saying you called
9  D-Juan?
10     A.  I called D-Juan.
11     Q.  Okay.
12     A.  And I say the police is here.  One went
13  in the gate -- well, both of them went in the
14  gate.  One came back out and got in the car,
15  because he had come out and started running, and
16  the one chased him.
17     Q.  So what did D-Juan say when you told
18  him the police are here?
19     A.  He say he out of here.
20     Q.  And then did you see him do anything?
21  Could you see him?
22     A.  I seen him running.
23     Q.  Okay.  And which officer chased D-Juan?
24     A.  The tallest one.

**ESQUIRE SOLUTIONS**                    **800.211.DEPO (3376)**
**EsquireSolutions.com**

DEXTER MOORE
D-JUAN OWENS vs. CITY OF HARVEY

January 2, 2015

**41**

1   Q.   Okay.  So the shorter one, you're
2   saying --
3        A.   He went back and got in the car and he
4   went up 147th Street to Ashland.
5        Q.   Okay.  Did the officer immediately come
6   and get back in the car?
7        A.   Yeah, when they saw him running.
8        Q.   Okay.  So he never -- the shorter
9   officer never left the Ridez parking lot, is what
10  you're saying?
11       A.   He left.  He came out of the Ridez
12  parking lot and came back out and got into the
13  patrol car.
14       Q.   Right.  But I'm saying, the shorter
15  officer never followed D-Juan at all?
16       A.   No, he didn't.  No, he
17  didn't follow him.  Not chase him, is what I want
18  to say.
19       Q.   Could you see how D-Juan left the Ridez
20  parking lot?
21       A.   The same way out of the lot the way he
22  went in at.
23       Q.   Okay.
24       A.   And the other officer followed -- I

**42**

1   mean, was chasing him.
2        Q.   You're saying he went through the hole
3   in the fence?
4        A.   Through the hole in the fence.
5        Q.   All right.  He didn't go over the
6   fence?
7        A.   Over the fence?  The hole -- you know,
8   I'm not for sure on that part.  But I know I seen
9   him coming out of the lot, and the other officer
10  was chasing -- the taller officer was chasing him.
11       Q.   All right.  So it's really important
12  that we just get what you actually remember.
13       A.   Saw, okay.
14       Q.   If you don't remember, you know, how he
15  exited the lot or if you didn't see exactly what
16  happened, we need to know that so that we can
17  distinguish between, you know, what you actually
18  remember and like what you think might have
19  happened, okay?
20       A.   Okay.
21       Q.   So do you know for sure how he exited
22  the parking lot?
23       A.   Okay.  I don't remember how he exited.
24       Q.   Okay.  Fair enough.  We don't want you

**43**

1   to guess on anything.
2        A.   Okay.
3        Q.   We've already had D-Juan tell us his
4   version of the event, so, you know, we're just
5   trying to piece together what happened.
6        A.   What happened, okay.
7        Q.   Okay?
8        A.   I don't remember how he exited.  But, I
9   mean, you don't want me to think?
10       Q.   To guess.
11       A.   To guess.  But, you know, I don't know.
12       Q.   You don't know?
13       A.   I don't remember how.  I don't know
14  whether he went in the same way that I said that
15  we had cut the fence, I don't know whether he went
16  out that way.  But -- I do not know how he got
17  out, but I do remember seeing the officer chasing
18  him.
19       Q.   Did they like chase each other around
20  the lot or where did they chase each other?
21       A.   He chased him coming out the lot, over
22  the fence -- well, I can't say over the fence.
23  Like I say, I don't know.  What I do remember
24  seeing him doing is when -- out of the lot, I seen

*(10)*
*sustand*
*403*
*(confusion)*

**44**

1   the police chasing him.  So how he got out, I
2   can't say.
3        Q.   Okay.  So when the officers entered the
4   lot, did they walk around the lot or did they
5   immediately go up to the U-Haul truck?  What
6   happened?
7        A.   From what I can see, he was standing on
8   the back.  When they entered the lot, the officer
9   did, he was standing on the back of the U-Haul
10  truck.  I seen him run, and then I see the officer
11  chase him.
12       Q.   Okay.
13       A.   But how he got out, you know, I
14  don't -- you know, I couldn't really tell until he
15  exited the lot.
16       Q.   Okay.
17       A.   And that's when I seen him running down
18  the side of the houses.
19       Q.   Okay.  Were the windows of the U-Haul
20  truck up or down -- sorry, the tow truck up or
21  down?
22       A.   They was down.
23       Q.   Okay.  Did you have any music on?
24       A.   No, I didn't.

**DEXTER MOORE**
**D-JUAN OWENS vs. CITY OF HARVEY**　　　　　　　　　**January 2, 2015**

---

**45**

1 Q. Could you hear any conversation or
2 verbal communication between the officers and
3 D-Juan?
4 A. No, I couldn't.
5 Q. Okay. So the officer just approached
6 the U-Haul truck that D-Juan was at and then
7 D-Juan fled and the officer followed him?
8 A. Yeah.
9 Q. That's what you're saying?
10 A. Yeah, yeah.
11 Q. And what happened once the shorter
12 officer got back to the police car? Where did he
13 go?
14 A. He went down to the next block, which
15 is Ashland.
16 Q. Okay.
17 A. And turned in there, and that's when
18 the other officer had D-Juan down on the ground
19 and was hitting him and stuff.
20 Q. Did you watch the other officer when he
21 was in his police car when he got back in there?
22 A. I watched him until he went down to
23 Ashland.
24 Q. Did you see him do anything in the

---

**46**

1 police car, make any radio calls or anything like
2 that?
3 A. No, I didn't.
4 Q. Okay. Could you see him in the car?
5 A. I could see him, yes.
6 Q. And then you're saying that the officer
7 drove along 147th?
8 A. And went to Ashland.
9 Q. Which direction did he go on Ashland?
10 A. He went to -- he turned north on
11 Ashland. He turned and made a left turn on
12 Ashland.
13 Q. A left?
14 A. Yeah.
15 Q. Okay.
16 A. Off 147th Street, he turned left on
17 Ashland.
18 Q. Okay.
19 A. I mean a right. I mean right. He made
20 a right on Ashland.
21 Q. Okay. And then did he keep going on
22 Ashland or what happened?
23 A. No. He stopped. He stopped about --
24 Q. You can put a "P" where he stopped.

---

**47**

1 A. Okay. I'd say about right in there
2 (indicating).
3 Q. Okay.
4 A. And that's where the other officer had
5 D-Juan down on the ground, which D-Juan had fell.
6 I don't know what happened, why he fell or why he
7 quit running. I mean, I can't assume that. But I
8 seen him down, and he had his hands up in the air.
9 Q. Okay.
10 A. Like this (indicating).
11 Q. So you put another "P" basically --
12 A. Right here on Ashland, right there
13 (indicating).
14 Q. And so that's basically in the middle
15 of --
16 A. Yeah, I'm saying in the middle.
17 Q. -- 146th and 147th?
18 A. In the middle of 146th and 147th.
19 Q. On Ashland?
20 A. On Ashland.
21 Q. Is where the police car then stopped?
22 A. Stopped.
23 Q. Was he facing north or south?
24 A. The police car?

---

**48**

1 Q. Yes.
2 A. He was facing north.
3 Q. Okay.
4 A. He was facing this way on Ashland
5 (indicating).
6 Q. When he drove from where he was
7 originally parked by the Ridez car dealership at
8 Vine on 147th to the middle of Ashland, did he
9 have any lights on, police lights, Mars lights?
10 A. The flashing lights?
11 Q. Right.
12 A. No, no.
13 Q. Were his sirens on or anything?
14 A. No, the sirens were not on. His lights
15 was on. I mean --
16 Q. His car lights?
17 A. Yeah, the car lights.
18 Q. Okay. Because it was nighttime?
19 A. It was nighttime, yeah.
20 Q. When the officers went into the Ridez
21 lot, could you see if they had anything in their
22 hands?
23 A. No, I couldn't.
24 Q. Okay. When you -- you saw the officer

---

ESQUIRE SOLUTIONS　　　　　　　　800.211.DEPO (3376)
EsquireSolutions.com

DEXTER MOORE
D-JUAN OWENS vs. CITY OF HARVEY

January 2, 2015

49

1  get out of their car, though, right?
2      A.  Yeah.  I saw them get out of their car.
3      Q.  Did they have their guns out or
4  anything?
5      A.  Not a gun.  They had the flash -- you
6  know, the flashlights.
7      Q.  But they didn't have their guns out?
8      A.  No, I didn't see no guns out.
9      Q.  Did you move your car at all after
10  D-Juan left?
11      A.  No.  I just got out of the truck and
12  walked back to the -- walked back to the house.
13      Q.  So after D-Juan ran out of the parking
14  lot, you got out of the truck?
15      A.  Out of the tow truck.
16      Q.  And where did you go?
17      A.  I went back to 149th and Marshfield.  I
18  went back to the house.
19      Q.  So you left?
20      A.  I left.  I'm saying, I seen him abusing
21  him, what they did to him.  I seen that part, but
22  wasn't nothing I could do to help him.  And then,
23  like I say, I didn't want to commit myself,
24  neither.

50

1      Q.  After the police arrived and D-Juan had
2  run, had fled, why did you stay in the truck?
3      A.  I was watching to see whether he was
4  going to get away or not.
5      Q.  Okay.  Could you see him when he was
6  running through the alleys and stuff?
7      A.  I seen him running through the alley.
8  I seen him when he came out on Ashland.
9      Q.  Right.  But the alleys were between
10  houses and whatnot?
11      A.  Right.
12      Q.  So you couldn't see him when he was
13  running through the alley?
14      A.  I seen him when he ran through the
15  alley when the police was chasing him.  When the
16  police was chasing him, that's when I got out of
17  the truck and walked down the street, walked down
18  the street.  Well, not -- I walked down the street
19  to see what was going on.
20      Q.  Okay.  So you kind of told me two
21  different things there.  At one point you said
22  that you stayed in the truck and watched D-Juan
23  run through the alley, right?
24      A.  Run through the alley.  I got out of

51

1  the truck and walked down the street.
2      Q.  At what point did you get out of the
3  truck and walk down the street?
4      A.  When I seen him run out of the lot and
5  with the police chasing him, that's when I got out
6  of the truck.
7      Q.  And where did you walk to?
8      A.  I walked down 147th toward Ashland.
9      Q.  Okay.  And did you stop at a certain
10  point in time or did you keep walking along 147th?
11      A.  Well, I mean, I was walking slow.  I
12  stopped at one point when I seen they had him down
13  on the ground.
14      Q.  Okay.
15      A.  And I seen what I seen, you know.
16      Q.  Where did you stop on 147th Street?
17      A.  Right there at Ashland.
18      Q.  Okay.  So you walked all the way from
19  Vine Avenue --
20      A.  From Vine.
21      Q.  -- over to the intersection of Ashland
22  and you stood at that intersection?
23      A.  On Ashland, I seen they had him on the
24  ground.

52

1      Q.  Okay.  Was there anyone else around at
2  that time?
3      A.  I didn't see no one else.
4      Q.  No other pedestrians?
5      A.  No other pedestrians.  You know, cars
6  was going back and forth.
7      Q.  Right.  Were there a lot of cars that
8  were going --
9      A.  They was going back and forth.  Some
10  slowed down and was observing, you know, what was
11  going on, too, so, you know.  But basically, I
12  didn't see no more pedestrians.
13      Q.  So some people slowed down and looked
14  at what was going on?
15      A.  Yeah.
16      Q.  But nobody stopped?
17      A.  Nobody actually just stopped.
18      Q.  Okay.
19      A.  Because, like I said, traffic was
20  both ways.
21      Q.  Okay.  About how many
22  went by?
23      A.  Maybe back and
24  five, ten.

ESQUIRE SOLUTIONS

**DEXTER MOORE**
**D-JUAN OWENS vs. CITY OF HARVEY**                     **January 2, 2015**

---

**53**

1   Q. Okay. And so how were you able to see
2 D-Juan going through the alleyways if there were
3 houses and whatnot?
4   A. I seen the way that he ran. So, I
5 mean, he ran between alleys. I can see which way
6 he ran. He had to run through the houses to get
7 to the next block over. I seen the police chasing
8 him.
9   Q. But you couldn't see him?
10   A. I couldn't see him running through -- I
11 mean, see him running through the houses, but I
12 knew he had to come out over on Ashland, you know.
13   Q. That was the only exit --
14   A. That was --
15   Q. -- right?
16   A. -- the only exit, yeah.
17   Q. I'll remind you, again, just let me
18 finish my questions first before you answer.
19   A. Okay.
20   Q. But at some point you lost vision of
21 D-Juan?
22   A. Yeah, I did.
23   Q. Was that pretty much as soon as he
24 started to run from the Ridez parking lot?

**54**

1   A. Right.
2   Q. So you couldn't see him from the point
3 he left the Ridez parking lot until he came out on
4 Ashland, right?
5   A. Right.
6   Q. And at the point he reappeared on
7 Ashland, when you could see him again, you're
8 saying that you were standing at the corner of
9 147th and Ashland?
10   A. Ashland, yes, I was.
11   Q. Okay. And D-Juan and the police
12 officer were in the middle of the block, right?
13   A. Right.
14   Q. And when D-Juan came out on Ashland,
15 was the police car already there?
16   A. Yes.
17   Q. So the police car arrived there first
18 and then D-Juan came out on Ashland?
19   A. D-Juan, yes, yes, yes.
20   Q. Was D-Juan facing the police car when
21 he came out on Ashland or was he facing away from
22 the police car?
23   A. Well, when he came out on Ashland, he
24 was like looking this way (indicating). He

**55**

1   didn't -- when he came out on Ashland, he didn't
2 turn on Ashland and come back towards 147th
3 Street. When he came out on Ashland, the other
4 officer that was chasing him, he had fell.
5   Q. Who fell?
6   A. (Indicating)?
7   Q. D-Juan?
8   A. D-Juan fell. But he said -- I mean --
9 well, you said not to assume. But I don't know
10 what made him fell -- I mean, fell, to stop
11 running, but he had fell. He was on the ground on
12 Ashland with his hands up in the air like this
13 here (indicating).
14   Q. My question was, though -- and I
15 appreciate that information, and we'll kind of
16 break it down as we go.
17        Was D-Juan north or south of the police
18 car when he came out on Ashland Avenue?
19   A. He was east.
20   Q. He was east of it?
21   A. I mean, west of it. He was west. When
22 he came out on Ashland, he fell right there on
23 Ashland, but he was facing going east.
24   Q. Okay. So he was beside the police car,

**56**

1   is what you're saying?
2   A. The police car hadn't got up to him
3 yet.
4   Q. Okay. So the police car was south of
5 him, then?
6   A. Yeah. The police car was coming, yeah,
7 coming from the south.
8   Q. Okay.
9   A. Yeah.
10   Q. So D-Juan was north of the police car?
11   A. North of the police car, yes.
12   Q. And he was facing east back towards the
13 car dealership?
14   A. No. He was facing west.
15   Q. Okay. Directions are confusing, I
16 know --
17   A. He was facing west.
18   Q. -- but we have to get a clear record.
19   A. Okay.
20   Q. So he was facing west, right?
21   A. Right.
22   Q. And that makes sense because he came
23 running out of the alleyway, right?
24   A. Right, right.

**DEXTER MOORE**
**D-JUAN OWENS vs. CITY OF HARVEY**

**January 2, 2015**

---

57

1      Q.   Okay. And was the police -- the taller
2   police officer that was chasing him, was he behind
3   D-Juan --
4      A.   Yes.
5      Q.   -- or in front of him?
6      A.   He was behind him. He was chasing him.
7      Q.   And D-Juan stopped, right?
8      A.   He stopped, fell, whatever happened,
9   you know, but he was on the ground.
10      Q.   You couldn't tell why he fell?
11      A.   I couldn't tell that.
12      Q.   Did he turn around and face the police
13   officer?
14      A.   I seen him, he was down on his knees
15   with his hands up like this (indicating). The
16   patrol car was coming up and D-Juan was behind
17   him, you know, so I don't know, but --
18      Q.   So did he turn and face the police
19   officer that was chasing him?
20      A.   No.
21      Q.   He just was kneeling down on the
22   ground --
23      A.   On the ground.
24      Q.   -- and you're saying his hands were up?

---

58

1      A.   Hands up in the air, yes.
2      Q.   So you were down the block. Could you
3   hear D-Juan say anything?
4      A.   No, I couldn't.
5      Q.   Did you see him talking at all?
6      A.   No.
7      Q.   Okay. What about the police officer,
8   did you hear him say anything to D-Juan?
9      A.   He was hitting him.
10      Q.   But did you hear him say anything to
11   D-Juan?
12      A.   No, I didn't. The only thing I seen
13   was he was -- you know, he was striking him.
14      Q.   Could you see the police officer's
15   mouth moving but you just couldn't hear anything
16   that he was saying?
17      A.   I couldn't hear a thing, no. I
18   couldn't.
19      Q.   You could not hear?
20      A.   I could not hear.
21      Q.   And you could not see his mouth moving?
22      A.   I could not see his mouth moving.
23      Q.   So you don't know one way or the
24   other --

---

59

1      A.   What he said, no. I couldn't hear.
2      Q.   So you don't know whether they
3   exchanged --
4      A.   Words or what, no.
5      THE REPORTER: Can you please let her finish
6   her question and then you can answer?
7      THE WITNESS: Yes, ma'am.
8          (WHEREUPON, the record was read by
9          the reporter.)
10   BY THE WITNESS:
11      A.   No, I couldn't.
12   BY MS. SMEENK:
13      Q.   So you don't know one way or another
14   whether the police officer and D-Juan exchanged
15   words at all?
16      A.   No, I don't.
17      Q.   Like I said in the beginning, my
18   questions are going to be real obvious and I know
19   like in everyday conversation when we talk to one
20   another, you kind of talk over people if you know
21   what they're going to say to make things faster.
22   But for this process, we just need to --
23      A.   Okay.
24      Q.   -- take it slow, unfortunately.

---

60

1      A.   Okay, okay, okay.
2      Q.   Did the officer that was in the police
3   car get out of the car at all or did he stay in
4   the car?
5      A.   He got out.
6      Q.   At what point did he get out?
7      A.   When D-Juan was on the ground.
8      Q.   Okay. When D-Juan fell to his knees
9   and put his hands up, then what happened?
10      A.   I seen the officer that was chasing him
11   strike him a couple of times, two or three times.
12   And after that, I just walked on off and stuff.
13      Q.   How did the officer strike him?
14      A.   Like with the flashlight he had in his
15   hand or whatever object, the night stick or
16   whatever he had in his hand, he hit him with that.
17      Q.   So you don't know what the object was?
18      A.   No. I -- no.
19      Q.   Okay. Did the officer have his gun
20   drawn?
21      A.   I didn't see the gun drawn.
22      Q.   Okay. And you said he hit him about
23   two, three times?
24      A.   Yes.

---

**ESQUIRE SOLUTIONS**

**DEXTER MOORE**
**D-JUAN OWENS vs. CITY OF HARVEY**                    January 2, 2015

---

**61**

1  Q.  Where did he hit him?
2  A.  The side of the head.
3  Q.  Where was D-Juan looking when he hit
4  him?
5  A.  He was looking down.
6  Q.  Okay.  What did D-Juan do when he got
7  hit?
8  A.  He had his hands -- like I say, he had
9  his hands up and I guess he was trying to block
10 the blows from, you know, hitting him upside --
11 hitting him in the head.
12 Q.  But you don't know?
13 A.  I don't -- I mean, no, I don't.  I
14 can't, no.
15 Q.  So you don't remember what D-Juan did?
16 A.  I don't remember what D-Juan did, no.
17 I can't remember that.
18 Q.  That's fine.  Like I said, we don't
19 want you to guess.  If you don't know, that's
20 fine.
21 A.  Okay.
22 Q.  And when he hit him, when the police
23 officer hit him those two, three times, were they
24 kind of all in a row real quick or how did they

---

**62**

1  happen?
2  A.  They happened continuous.
3  Q.  They happened what?
4  A.  You know, like (indicating), one or two
5  times, you know.
6  Q.  Like fast?
7  A.  Fast, yeah, fast.
8  Q.  And then what happened after he hit him
9  those one to three times?
10 A.  I walked off.
11 Q.  So you don't know?
12 A.  I don't know.
13 Q.  Did you see D-Juan get handcuffed or
14 anything like that?
15 A.  No, I didn't.
16 Q.  Did the second officer get out of the
17 car after the first officer that had been chasing
18 D-Juan --
19 A.  Yes.
20 Q.  Wait.  Just let me finish.
21 A.  Okay.
22 Q.  Did the second officer get out of the
23 car after the taller officer had already hit
24 D-Juan?

---

**63**

1  A.  Yeah, he got out.
2  Q.  But it was after the taller officer hit
3  D-Juan?
4  A.  He got out and hit him, too.
5  Q.  Okay.  But you said after --
6  A.  After the one that was chasing him hit
7  him, then the other one got out.
8  Q.  Okay.  Then the second officer --
9  A.  The second one, the one that was
10 driving the car, he got out.
11 Q.  So it was after the first officer --
12 A.  Had hit him, yes.
13 Q.  And you said at that point you had
14 left, right?
15 A.  I walked off, yes.
16 Q.  So how did you see the second officer
17 hit D-Juan, then?
18 A.  It looked like I seen him hitting him.
19 Okay.  You said not to -- I'm sorry.  I'm sorry.
20 Q.  So you don't know --
21 A.  I don't know.  I don't know.
22 Q.  -- whether the second officer --
23 A.  If the officer hit him or not, I don't
24 know.

---

**64**

1  Q.  Just let me finish.
2  A.  Okay.
3  Q.  You don't know whether the second
4  officer hit D-Juan or not because you had walked
5  away at that point, right?
6  A.  Right, right, right.
7  Q.  Okay.  Did you ever see D-Juan turn and
8  face the officer that was chasing him?
9  A.  No.
10 Q.  Did you see D-Juan move towards the
11 officer at all?
12 A.  No, I didn't.
13 Q.  Did you ever see D-Juan get up off the
14 ground?
15 A.  No.
16 Q.  When you left, was D-Juan still
17 kneeling?
18 A.  Still kneeling.
19 Q.  Okay.  Did you ever see him lay down
20 flat on the ground?
21 A.  No, I didn't.
22 Q.  Okay.  Did you ever see either of the
23 officers kick D-Juan?
24 A.  No, I didn't.

---

**ESQUIRE SOLUTIONS**

**DEXTER MOORE**
**D-JUAN OWENS vs. CITY OF HARVEY**                    **January 2, 2015**

---

**65**

1    Q.   So because D-Juan was kneeling on the
2  ground when he got hit, I assume that they didn't
3  move anywhere when the officer was hitting him,
4  right?
5    A.   Right.
6    Q.   They stayed in the same place?
7    A.   In the same position.
8    Q.   Right.  In the middle of Ashland and in
9  between 147th and 148th, right?
10   A.   Right.
11   Q.   Did you ever see either of the officers
12 drag D-Juan?
13   A.   No.
14   Q.   Okay.  Did you ever hear D-Juan make
15 any noises or anything like that when he was
16 getting hit?
17   A.   No.
18   Q.   Okay.  How long did that altercation
19 with the officer last that you saw?
20   A.   Maybe three to four minutes.
21   Q.   Three to four minutes?
22   A.   Uh-huh.
23   Q.   Okay.  But you said the officer quickly
24 struck him a couple times, right?

**66**

1    A.   Yeah.  See, I'm walking at the same
2  time myself.  Because, I mean, you told me not to
3  volunteer information.  But I still did not want
4  to just stay there and watch him get abused the
5  way he was — I mean, the way they was doing it.
6  I kept walking.
7    Q.   Okay.  So did you keep walking west
8  along 147th?
9    A.   Yes.
10   Q.   Okay.  And you never turned around
11 again?
12   A.   No.
13   Q.   Okay.  So I'm just trying to understand
14 your estimate of three to four minutes.  How long
15 were you — how long did you observe the
16 interaction between D-Juan?
17   A.   Like I say, maybe two to three minutes,
18 and then I walked on off.
19   Q.   But that wasn't — the two to three
20 minutes that you observed, D-Juan wasn't getting
21 hit that whole time, was he?
22   A.   No.  He wasn't getting hit the whole
23 time; but I seen the first two or three —
24   Q.   Hits?

**67**

1    A.   — hits.
2    Q.   Okay.
3    A.   But I'm still walking at the same time.
4    Q.   That's fine.
5         So what else happened besides — if you
6  observed two to three minutes of D-Juan and the
7  officer being together on Ashland Avenue, what
8  else happened in those two to three minutes?
9    A.   Being handcuffed; and I'm out of there,
10 I'm gone.
11   Q.   All right, sir.  You already told me
12 earlier that you never saw D-Juan being
13 handcuffed, so I don't want you to guess.  We just
14 need to break down what you actually observed.
15   A.   Okay, okay.
16   Q.   Did you see D-Juan get handcuffed?
17   A.   No, I didn't see him get handcuffed.
18 But — I ain't going to say it.
19   Q.   Go ahead.
20   A.   No.  I'm going to let you finish.
21   Q.   So what else happened between the
22 officer and D-Juan that you observed other than
23 the —
24   A.   The hits.  I did not observe nothing

**68**

1  else after that.
2    Q.   So those hits you already testified
3  happened quickly, right?
4    A.   Right, right.
5    Q.   So did you only observe a few seconds
6  of D-Juan and the officer interacting?
7    A.   Right.
8    Q.   And then you kept on walking?
9    A.   Kept on walking.
10   Q.   So it was not two to three minutes?
11   A.   No, not two to three minutes.
12   Q.   It was maybe 30 seconds?
13   A.   Seconds.  Yeah, okay.
14   Q.   Okay.  Did you see the officers gain
15 control of D-Juan?
16   A.   No.
17   Q.   You were already gone?
18   A.   Already gone.
19   Q.   Did you see the officers pat D-Juan
20 down?
21   A.   No.
22   Q.   Was anyone else present besides those
23 two officers and D-Juan, that you saw?  Any other
24 pedestrians or anyone else in the area?

---

**DEXTER MOORE**
**D-JUAN OWENS vs. CITY OF HARVEY**                                      January 2, 2015

**69**

1    A.   No, I didn't.  I didn't observe anyone
2    else.
3    Q.   Okay.  And then you said you went back
4    to your house, is that right?
5    A.   Right.
6    Q.   And was anybody home?
7    A.   His mother.
8    Q.   Okay.  Did you talk to her about what
9    happened?
10   A.   I told her the police had him.
11   Q.   You told her what?
12   A.   That the police had him.
13   Q.   Had D-Juan?
14   A.   Had D-Juan, yeah.
15   Q.   And what did she say?
16   A.   You know, he said he'll call when he
17   can get bail.  He'll call and try to get bailed
18   out or whatever.
19   Q.   Okay.  When did you see D-Juan next
20   after that night?
21   A.   I didn't see him after that night
22   because he was locked up.
23   Q.   So you didn't go to the hospital?
24   A.   No.  I didn't know -- I didn't know he

**71**

1    A.   No, I didn't.
2    Q.   He's never told you that he filed a
3    lawsuit?
4    A.   No, he didn't.
5    Q.   How did he explain why he wanted you to
6    come to Chicago?
7    A.   He say he wanted me to come up here to
8    talk to a lawyer.
9    Q.   Okay.  And did you say, What about?
10   A.   I assumed it was about what had
11   happened that night.
12   Q.   Why did you assume that?
13   A.   That's the only thing it could have
14   been.
15   Q.   Okay.  Did you ask what kind of a
16   lawyer?
17   A.   No.  He just said I need to come up
18   here and talk to a lawyer.
19   Q.   Okay.  So you just came to Chicago for
20   this particular --
21   A.   No.  I come up here every year to
22   visit.  You know, I still have family here.  And
23   it was the holidays, so, I mean, maybe the time
24   was right for now.  You know, I don't know.

**70**

1    had to go to the hospital until later.
2    Q.   Okay.  Did you see D-Juan again between
3    that night and the time that you moved away from
4    Illinois?
5    A.   No, I didn't.  He was locked up.
6    Q.   Okay.  Did you talk to him at all about
7    what happened?
8    A.   No, I didn't.
9    Q.   You've never talked to D-Juan about
10   what happened that night?
11   A.   No, I didn't.  Not until today.
12   Q.   Okay.  I assume he contacted you to
13   come here for this deposition, right?
14   A.   Yes, he did.
15   Q.   And you hadn't talked to him about it
16   before that?
17   A.   No, I haven't.
18   Q.   Did you ask, you know, what is this
19   deposition and what's it about?
20   A.   Well, I kind of figured that it was
21   about what happened that night.
22   Q.   Why did you figure that?
23   A.   Because I seen him get abused.
24   Q.   Okay.  Did you know he filed a lawsuit?

**72**

1    Q.   How long are you planning on staying in
2    Chicago?
3    A.   Maybe about a month.
4    Q.   All right.  And where are you going to
5    stay during that time?
6    A.   I'm going to stay with my daughter.
7    Q.   Okay.  Where does she live?
8    A.   Minnesota.
9    Q.   What's her address?
10   A.   I couldn't tell you that.
11   Q.   Is that where you're going back today
12   after this?
13   A.   After this deposition here?  No.  I'm
14   going to be here in Chicago for a few days.
15   Q.   Well, you just said a month.
16   A.   I'm saying, I'm going to be here for a
17   month, but I'm going to Minnesota.
18   Q.   Oh, okay.  So your daughter lives in
19   Minnesota?
20   A.   Yes.
21   Q.   And where do you stay when you're in
22   Chicago?
23   A.   With my son.
24   Q.   Where does he live?

(11)
Overruled
401

**DEXTER MOORE**
**D-JUAN OWENS vs. CITY OF HARVEY**

**January 2, 2015**

73

| | |
|---|---|
| 1 | A. On 76th and Essex. |
| 2 | Q. What's the address? |
| 3 | A. 76th and Essex. The exact address, I |
| 4 | can't say. |
| 5 | Q. What's his name, your son? |
| 6 | A. Parish. |
| 7 | Q. Parish? |
| 8 | A. P-a-r-i-s-h, yeah. |
| 9 | Q. And what's his -- that's his last name |
| 10 | or first name? |
| 11 | A. His last name is Drake. |
| 12 | Q. Drake? |
| 13 | A. Yes. |
| 14 | Q. Parish Drake? |
| 15 | A. Yes. |
| 16 | Q. Does he have a middle name? |
| 17 | A. Not that I know of. |
| 18 | Q. Okay. Do you know his phone number? |
| 19 | A. No, I don't. |
| 20 | Q. Do you have it in your phone? |
| 21 | A. No, I don't. |
| 22 | Q. Okay. Have you ever talked to D-Juan's |
| 23 | mother about what happened that night besides that |
| 24 | initial conversation you told me? |

75

| | |
|---|---|
| 1 | conversation. |
| 2 | Q. Okay. On October 23, 2011, the night |
| 3 | that you went with D-Juan to the Ridez dealership, |
| 4 | had you consumed any drugs or alcohol that night? |
| 5 | A. No, I haven't. |
| 6 | Q. No beers? |
| 7 | A. No nothing. |
| 8 | Q. No nothing? |
| 9 | A. No nothing. |
| 10 | Q. Okay. Had D-Juan consumed any drugs or |
| 11 | alcohol that night? |
| 12 | A. No, not that I knew of. |
| 13 | Q. Okay. Were you with him? |
| 14 | A. I wasn't with him all day. But at the |
| 15 | time of this incident we talking about, he had did |
| 16 | nothing; and I hadn't, neither. |
| 17 | Q. How did you know that -- how do you |
| 18 | know that he hadn't consumed any drugs or alcohol |
| 19 | before you were together? |
| 20 | A. Just the way that he controlled |
| 21 | hisself. |
| 22 | Q. How did he control himself? |
| 23 | A. He controlled hisself with a level mind |
| 24 | and a level head. |

74

| | |
|---|---|
| 1 | A. No, I haven't. |
| 2 | Q. Pardon? |
| 3 | A. No, I haven't. |
| 4 | Q. Do you know if she ever went and talked |
| 5 | to D-Juan about what happened? |
| 6 | A. No, I do not. |
| 7 | Q. Did you ever ask about the outcome of |
| 8 | what was going on with D-Juan being arrested that |
| 9 | night, anything like that? |
| 10 | A. The only thing I knew is that he had |
| 11 | been locked up for a couple years or something -- |
| 12 | I mean, for a year. He was locked up. That's the |
| 13 | only thing I had heard. |
| 14 | Q. And who told you that? |
| 15 | A. His mother. |
| 16 | Q. Okay. When did you talk to her about |
| 17 | that? |
| 18 | A. I mean, it's been maybe a year or two |
| 19 | ago. |
| 20 | Q. Did you talk to her about that when you |
| 21 | were still living in Illinois? |
| 22 | A. No, I didn't. |
| 23 | Q. When you moved back to Alabama? |
| 24 | A. It was after I moved back, over a phone |

76

| | |
|---|---|
| 1 | Q. Okay. |
| 2 | A. He was -- you know, he was straight. |
| 3 | Q. So you were at considerate level to run |
| 4 | from the police? |
| 5 | A. I mean, going to do -- to commit a |
| 6 | crime, in my situation, you don't go out to commit |
| 7 | a crime as being high, drunk or something like |
| 8 | that. You got to be straight because you got to |
| 9 | know what you're doing. I mean, that's my |
| 10 | assumption of committing a crime. I mean, I don't |
| 11 | go commit a crime being drunk. |
| 12 | Q. You wouldn't, but you don't know -- |
| 13 | A. I'm just saying, but, I mean, you |
| 14 | could tell -- well, I guess you probably could |
| 15 | tell. But he didn't seem drunk or on drugs to me. |
| 16 | I'll just leave it like that. |
| 17 | Q. But you don't know whether he was? |
| 18 | A. I don't -- I don't know. No, I don't. |
| 19 | Q. Were you with him -- obviously you were |
| 20 | with him immediately before you went to the Ridez |
| 21 | car dealership? |
| 22 | A. Right. |
| 23 | Q. You were at the house together, right? |
| 24 | A. Right, right. |

*Handwritten annotations in left margin:*

12)

overruled as to 73:22 - 74:6 (401)

sustained as to 74:7 - 75:1 (hearsay + context for hearsay)

+ 401 (what he understood as to sentence is irrelevant)

**ESQUIRE SOLUTIONS**

DEXTER MOORE
D-JUAN OWENS vs. CITY OF HARVEY

January 2, 2015

**77**

```
 1     Q.   How long had you been at the house
 2   together before you went to Ridez?
 3     A.   I'd say maybe four, five hours.
 4     Q.   Was there anybody else over there?
 5     A.   His mom was there.
 6     Q.   Besides his mom?
 7     A.   No, nobody else but us.
 8     Q.   No friends or anything?
 9     A.   No.  Me, him and his mom.
10     Q.   And were you hanging out or were you
11   all kind of doing your own thing?
12     A.   We were, you know, hanging out,
13   talking, watching TV; you know, what family do.
14     Q.   And when did you -- at what point did
15   you decide that you were going to go to Ridez to
16   steal these catalytic converters?  Was it that
17   night or had you talked about it before?
18     A.   No.  It was that night.
19     Q.   It was that night?
20     A.   That night.
21     Q.   How long before you actually went to
22   Ridez did you decide that?
23     A.   I'd say maybe about an hour or two.
24     Q.   All right.  And why were you going to
```

**78**

```
 1   steal the converters?
 2     A.   To get some money, sell them.
 3     Q.   Okay.  How much would you get for each
 4   converter?
 5     A.   It all depends on where you sell them
 6   at.
 7     Q.   On average?
 8     A.   Maybe 40, $50.
 9     Q.   What were you going to do with that
10   money?
11     A.   Spend it.
12     Q.   On what?
13     A.   Clothes.
14     Q.   Okay.
15     A.   Shoes.
16     Q.   All right.
17     A.   Gas.
18     Q.   All right.  Did you ever talk to D-Juan
19   about any injuries from this incident?
20     A.   I don't understand what you're saying.
21     Q.   Did you ever talk to D-Juan about like
22   if he got hurt from this incident?
23     A.   No, I didn't.
24     Q.   Was D-Juan's mother present when the
```

**79**

```
 1   two of you decided to --
 2     A.   No, she wasn't.
 3     Q.   -- go to Ridez?
 4     A.   No, she wasn't.
 5     Q.   Did she know you were going?
 6     A.   No, she didn't.
 7     Q.   Is today the first time that you've
 8   seen D-Juan since the incident?
 9     A.   Yes, it is.
10     Q.   Okay.
11     A.   Well, I talked to him over the phone,
12   but this is the first time seeing him in person
13   since that.
14     Q.   How often do you talk to him over the
15   phone?
16     A.   I talk to him -- he wished me a Merry
17   Christmas, wished me a happy birthday, so that
18   would have been last month.
19     Q.   And before that, since you moved back
20   to Alabama in 2012?
21     A.   I haven't heard from him.
22     Q.   So you don't talk on a regular basis?
23     A.   Not on a regular basis, no.
24     Q.   What about his mother, do you talk
```

(13)
Overruled
401

**80**

```
 1   to her on a regular basis?
 2     A.   Yeah, I talk to her on a regular basis,
 3   yes, I do.
 4     Q.   How often?
 5     A.   Maybe one or two times a month --
 6     Q.   Okay.
 7     A.   -- she'd call.  I call her, she call
 8   me.
 9     Q.   And does she kind of tell you what's
10   going on with D-Juan?
11     A.   Well, she tell me what's going on with
12   the family, I mean, you know.
13     Q.   In general?
14     A.   In general, yes.
15     Q.   All right.
16     A.   I ask about him, how everybody doing,
17   you know.
18     Q.   Did you ever talk to D-Juan about his
19   deposition in this case?
20     A.   I didn't know he had no case until now.
21     Q.   Okay.  But you can still answer my
22   question.  Have you ever talked to him about his
23   deposition?
24     A.   Dep -- what -- this is a deposition?
```

ESQUIRE SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

**DEXTER MOORE**
**D-JUAN OWENS vs. CITY OF HARVEY**

**January 2, 2015**

81

1    Q.   Yes.
2    A.   No, I never talked to him about it.
3    Q.   Did you ever talk to him about his kind
4    of version of the events that night?
5    A.   No.
6    Q.   No.
7         Did you ever talk to D-Juan's attorney
8    about this case?
9    A.   No, I haven't. This is my first time
10   meeting him.
11        That's his attorney right there, right?
12   Q.   Yes.
13   A.   The first time meeting him was today.
14   Q.   But did you ever talk to him over the
15   phone or anything?
16   A.   No. I never talked to him.
17   Q.   You were here obviously a little bit
18   earlier than I was today, right? I saw the three
19   of you come out of Mr. Patrick's office together,
20   right?
21   A.   When we first started talking to him,
22   yes.
23   Q.   And how long were you in there with the
24   two of them for?

82

1    A.   Maybe about five, ten minutes.
2    Q.   Okay. And what did you guys talk about
3    in there?
4    A.   He just told me, you know, what was
5    this going to be like and it wasn't going to be
6    long, and that was it.
7    Q.   Okay.
8    A.   I just filled him in on what I saw and
9    seen, and that was it.
10   Q.   And what did you tell him that you saw?
11   A.   I told him the same thing I just told
12   you.
13   Q.   Okay.
14   A.   That I seen the police chasing him,
15   running after him, hitting him and that, and that
16   was it.
17   Q.   Okay. And what did he say to you when
18   you told him that?
19   A.   Well, he told me that, you know, I
20   won't be committed to anything that I said and,
21   you know, it wouldn't come back against me or
22   something; you know, by me being there and seeing
23   and saying what I seen, it wouldn't affect me.
24   Q.   Did he say anything else?

83

1    A.   That's it.
2    Q.   What did you say to him when he said
3    that to you?
4    A.   I told him fine. I told him what I
5    saw.
6    Q.   And did D-Juan say anything when you
7    were in there?
8    A.   No. D-Juan didn't say nothing. I
9    mean, he just asked me. I did the talking. And
10   he said D-Juan had to be in there and he said he
11   would have to be in here when I said – like when
12   I told you what I saw and seen, and that was it.
13   Q.   Okay. Did you ask him what he thought
14   happened that night?
15   A.   Who? D-Juan?
16   Q.   Yes.
17   A.   No.
18   Q.   Did you review any materials or
19   anything like that to prepare for today?
20   A.   No, I didn't.
21   Q.   Have you ever seen a copy of the legal
22   complaint that D-Juan filed in this case?
23   A.   No, I haven't.
24   Q.   Have you seen a copy of D-Juan's

84

1    deposition transcript?
2    A.   No, I haven't.
3    Q.   Other than that night -- did you
4    interact with either of the Harvey Police officers
5    that night?
6    A.   No, I didn't.
7    Q.   Have you had any personal interactions
8    with the Harvey Police Department at all?
9    A.   No, I haven't.
10   Q.   You've never been arrested by the
11   Harvey Police?
12   A.   Yes, I have.
13   Q.   Well, that would be a personal
14   interaction.
15   A.   Oh, okay.
16   Q.   That's fine.
17        Do you know what a personal interaction
18   is?
19   A.   Being arrested by Harvey? This was
20   before this even happened to him.
21   Q.   That's fine.
22   A.   But I was arrested by them one time.
23   Q.   Okay.
24   A.   As a matter of fact, they arrested me

14
Overruled
401

**ESQUIRE SOLUTIONS**

800.211.DEPO (3376)
EsquireSolutions.com

DEXTER MOORE                                          January 2, 2015
D-JUAN OWENS vs. CITY OF HARVEY

---

**85**

1    for the DUI I was talking about.
2        Q.   Okay.
3        A.   But that was before this happened to
4    him.
5        Q.   Right.
6        A.   So this is after they had arrested me.
7    So I don't have no, I mean, conflict, anything
8    like that.
9        Q.   That's fine.  I need to understand.
10        So you've been arrested by Harvey
11   Police Department once, right?
12       A.   Right.
13       Q.   And have you ever gone to the Harvey
14   Police Station for anything else, any other
15   reason?
16       A.   No, I haven't.
17       Q.   All right.  Have you told us everything
18   you can remember about this incident on
19   October 23, 2011?
20       A.   Yes, I have.
21       Q.   Okay.
22       MS. SMEENK:  I think that's pretty much it.
23       MR. PATRICK:  I just have one question and
24   one question only.

---

**86**

1            EXAMINATION
2    BY MR. PATRICK:
3        Q.   Mr. Moore, at the very, very beginning
4    of this deposition, do you remember you testified
5    you had about four Miller High Lifes last night?
6        A.   Yes.
7        Q.   Has that affected -- strike that.
8            Were you impaired at the time of this
9    deposition?
10       A.   No, I'm not.
11       Q.   Okay.  Have those beers you had last
12   night during the football game affected your
13   ability to remember anything that happened on the
14   night of the incident?
15       A.   No.
16       MR. PATRICK:  Nothing for me.  Thanks.
17       MS. SMEENK:  Nothing based on that.
18            You can either choose to waive your
19   signature, which means that you're trusting that
20   this nice lady took down everything that you said
21   today accurately, or you can choose to reserve
22   your signature, in which case you can view a copy
23   of the transcript.  You can't change any of your
24   answers or anything like that, but like if there's

---

**87**

1    a typo, a spelling error or something like that,
2    that could be corrected.
3            So would you like to reserve your
4    signature or waive it?
5        THE WITNESS:  So what, I can sign it now or I
6    can wait?
7        MS. SMEENK:  If you waive it, you can choose
8    to trust that she took down everything accurately.
9        THE WITNESS:  If I waive it?
10       MS. SMEENK:  Right.
11       THE WITNESS:  Then I'll waive it.  Because
12   what I said today is the truth.  And if you want
13   me to sign something, I will.
14       MS. SMEENK:  No, you don't have to sign
15   anything.  It's on the record.
16       THE WITNESS:  Okay.
17       MS. SMEENK:  Thanks very much for your time,
18   Mr. Moore.
19       THE WITNESS:  Thank you.
20
21            FURTHER DEPONENT SAITH NOT.
22
23
24

---

**88**

1    STATE OF ILLINOIS )
2              ) SS:
3    COUNTY OF C O O K )
4            I, MARCY REITER, a Notary Public within
5    and for the County of Cook, State of Illinois, and
6    a Certified Shorthand Reporter of said state, do
7    hereby certify:
8            That previous to the commencement of
9    the examination of the witness, the witness was
10   duly sworn to testify the whole truth concerning
11   the matters herein;
12           That the foregoing deposition
13   transcript was reported stenographically by me,
14   was thereafter reduced to typewriting under my
15   personal direction and constitutes a true record
16   of the testimony given and the proceedings had;
17           That the said deposition was taken
18   before me at the time and place specified;
19           That I am not a relative or employee or
20   attorney or counsel, nor a relative or employee of
21   such attorney or counsel for any of the parties
22   hereto, nor interested directly or indirectly in
23   the outcome of this action.
24           IN WITNESS WHEREOF, I do hereunto set

---

ESQUIRE SOLUTIONS                          800.211.DEPO (3376)
                                           EsquireSolutions.com

**DEXTER MOORE**
**D-JUAN OWENS vs. CITY OF HARVEY**                    January 2, 2015

---

89

1    my hand of office at Chicago, Illinois, this 6th
2    day of January, 2015.
3
4
5
6              Notary Public, Cook County, Illinois.
7              My commission expires 4/14/2015.
8
9
10   C.S.R. Certificate No. 84-1890.
11
12
13
14
15
16
17
18
19
20
21
22
23
24

---

90

1              I N D E X
2    WITNESS              EXAMINATION
3    DEXTER MOORE
4      By Ms. Smeenk           3
5      By Mr. Patrick         66
6
7
8
9
10
11            E X H I B I T S
12   NUMBER              MARKED FOR ID
13   Owens Deposition
14     Exhibit No. 1          37
15
16
17
18
19
20
21
22
23
24

---

**ESQUIRE SOLUTIONS**                    800.211.DEPO (3376)
                                         EsquireSolutions.com